J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Erik Yates*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ERIK YATES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>DALE CARNEGIE & ASSOCIATES, INC., a New York corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:26-cv-08445<br><br>**CLASS ACTION COMPLAINT FOR (1) COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; (2) UNJUST ENRICHMENT; (3) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (4) INTRUSION UPON SECLUSION** |

## INTRODUCTION

1. Plaintiff, on his behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Dale Carnegie & Associates, Inc. ("Defendant" or "Dale Carnegie"). Dale Carnegie offers in person leadership and professional development courses across California, primarily in the San Francisco Bay area, as well as on demand and online courses. It markets the courses, and accepts enrollment, through its website, located at https://dalecarnegie.com (the "Website").

2. Defendant has installed and deployed data broker and social media software on its Website to secretly collect data about visitors to the Website, their devices, locations and activity to identify who they are, and target them with unwanted marketing. Further, the software facilitates the profiling of visitors, and the tracking of their internet browsing on a future basis, regardless of whether visitors have opened accounts on the advertising platforms.

3. The data broker and advertising platform software on the Website facilitates the identification of individual visitors through a process referred to as "browser fingerprinting." The software enables fingerprinting by ***transmitting visitors' data to at least three data brokers and at least two social media/advertising platform***. In addition, the software facilitates the correlation of data collected during visits to the Website and its correlation with extensive external records that these third parties already have about most Californians. The correlation enables the creation or enhancement of profiles on individuals for commercial exploitation, including the sale of data about individuals.

4. Both Defendant and the third-party data collectors behind the software at issue benefit commercially and financially from this activity. Defendant benefits because collected visitor data, and the identification of visitors using that data, are used to, *inter alia*, assess, analyze and target specific visitors with ads for Defendant's products. The data collectors benefit because they can commercially

exploit the data the software collects, including, in the case of data brokers, selling the data.

5. The collection and transmission of data commences before a visitor to the Website has any opportunity to either reject or consent to the use of cookies or tracking software.

6. Further, soon after the home page of the Website loads on a visitor's device, a banner offering to permit the visitor to "manage preferences" relating to the use of cookies and the sharing of data with third parties appears at the bottom of the page. It contains a hyperlink that prompts a pop up window captioned "Your Privacy Rights" to appear. The pop up purports to enable the visitor to "choose not to allow" Defendant to subject her visit to cookies other than Defendant's own cookies it refers to as "strictly necessary" for the functioning of the Website.

7. Defendant's representations regarding visitors' power to prevent or halt the operation of non-strictly-necessary cookies are fraudulent. Using Defendant's ***consent interface*** – consisting of the banner and the pop up – to reject the use of cookies that share data with third parties who track individuals future internet browsing and that facilitate the compiling of detailed profiles on individuals for commercial exploitation or sale, is ineffective. Such cookies continue to operate on visitors similarly situated to Plaintiff notwithstanding visitors' opting out of the use of such cookies. This continued operation results in third parties receiving additional data relating to visitors' activity on the Website, their devices and browsers.

8. Defendant's installation and use of data broker and advertising platform software without obtaining consent or authorization violated California Penal Code § 638.51, California's Trap and Trace Law. It also violated duties under applicable common law. Defendant's representations and omissions of material fact in its consent interface regarding visitors' ability to effectively prevent or halt the operation of non-strictly-necessary cookies on the Website form the basis of a claim for common law fraud, deceit and/or misrepresentation.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

10. Defendant Dale Carnegie & Associates is a New York corporation that is headquartered in Melville, New York.

11. This Court has specific personal jurisdiction over Defendant with respect to all claims asserted herein. Through the Website, Defendant offers in person leadership and professional development courses across California. Currently, the Website is selling enrollment in 51 in-person sessions of its courses to be held in the following cities in California: Oakland, Los Angeles, San Diego, Long Beach, Sacramento, Stockton, West Covina and Santa Ana. These sessions can be retrieved by a California-based visitor to the Website by entering her zip code in a form on the Website.

12. Defendant maintains ongoing commercial relationships with such California customers and residents. Defendant derives substantial revenue from California-based sales through its operation of the Website. Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website.

13. As described more fully herein, Defendant, through the Website and the data broker software, reaches into the devices of Website visitors located in California, depositing code and cookies onto the browsers and devices of those visitors in connection with the statutory and common law violations alleged by Plaintiff. Defendant intended and understood that such persons would suffer injury in California as a result of the actions underlying Plaintiff's claims, which involve

deployment of the data broker software on the Website.

14. Defendant has partnered with one California-based data broker and two social media/advertising platforms to install the software at issue in this matter. Data broker The Trade Desk, Inc. ("Trade Desk") maintains its principal offices in Ventura, California. LinkedIn Corp. ("LinkedIn") is headquartered in Sunnyvale, California. Meta is headquartered in Menlo Park, California.

15. Defendant's effort to attract viewers from California to the Website is aided by campaigns it runs on LinkedIn and Meta. The collection of visitor data by LinkedIn and Meta code Plaintiff installed on the Website allows LinkedIn and Meta to target visitors to the Website who use the LinkedIn and Meta platforms with specific advertising that is chosen based on those visitors' actions while on the Website.

16. Defendant's use of the LinkedIn code and advertising services are governed by a User Agreement that contains two provisions that tie this action to California. First, the User Agreement provides that any legal dispute between Defendant and LinkedIn relating to LinkedIn's code and services is governed by California law.[1] Second, it provides that all claims and disputes between Defendant and LinkedIn "can be litigated only in the federal or state courts in Santa Clara County, California, USA" and that Defendant "agree[s] to personal jurisdiction in those courts."

17. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District. In addition, a substantial part of the events or omissions

[1] *See* https://www.linkedin.com/legal/user-agreement (last viewed 8/12/2026).

giving rise to the claims herein occurred in this District, where Plaintiff resides and where he was located when he visited the Website.

## PARTIES

18. Plaintiff Erik Yates ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of this state, living in Oakland, California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

19. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

20. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

21. Defendant owns and operates the Website, which sells enrollment in courses on topics concerning leadership and professional advancement; customized corporate training services; and senior leadership coaching solutions.

22. Defendant runs marketing campaigns for its courses and services on the social media/advertising platforms, LinkedIn and Meta. These campaigns appear on the "feeds" of subscribers to the LinkedIn, Facebook and Instagram platforms.

23. Defendant has partnered with at least three registered California data broker, The Trade Desk, Inc. ("Trade Desk"), ZoomInfo Technologies Inc. ("Zoom Info") and Clickagy LLC ("Clickagy") (the "Data Brokers") in order to deanonymize and develop clandestine user profiles on otherwise anonymous website

visitors. Defendant has done this by installing code and tools proprietary to the Data Brokers (the "Data Broker Code") on the Website.

24. Defendant has also partnered with social media/advertising platforms LinkedIn and Meta ("Social Media Code") in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to LinkedIn and Meta on the Website.

25. The Data Broker Code and the Social Media Code (jointly the "Third-Party Code") deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Trade Desk and LinkedIn identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like Trade Desk, and social media company LinkedIn, to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including the visitor's geolocation, device information, identification and cross-referencing of malicious cookies installed on the visitor's devices, and other traits evident from the visitor's browsers.

**Browser Fingerprinting**

26. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to the Data Brokers, LinkedIn and Meta? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

27. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are. (These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.) Data Brokers and social

media companies may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

28. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

29. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to ***third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of visitors.*** The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

30. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[2]

31. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.

32. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad

---

[2] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 6/7/2026).

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 7/14/2026).

behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4] The Johns Hopkins ISI study confirms the ability of tracking software like the code at issue in this case to identify individual browsers, and therefore individuals, using non-personal data about devices and browsers: "Think of it as a digital signature you didn't know you were leaving behind. You may look anonymous, but your device or browser gives you away."[5]

**The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers**

33. Collection of visitor data by entities such the Data Brokers, LinkedIn and Meta – including collection by these entities of unique identifiers that the Third Party Code assigns to visitors to the websites of companies like Defendant – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of the Data Brokers, LinkedIn, Meta and similar organizations.

34. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a

[4] *Id.*
[5] *Id.*

> consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**Registered California Data Brokers**

35. Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

36. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

37. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

38. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[6]

39. Given the amount of data available by way of California registered data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

40. Here, Defendant partnered with the Data Brokers, LinkedIn and Meta by installing the Third Party Code onto the Website. Defendant allows the Data Brokers, LinkedIn and Meta to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

**Trade Desk Code**

41. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."

42. The Trade Desk code deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database.

---

[6] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users," Gizmodo.com (March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 6/24/2026).

According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."

43. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

44. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that their business depends on "ingesting more identifiable information" about individuals. Such information would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

45. The Trade Desk code deploys tracking cookies that are dropped on visitor's devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser. Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]". The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and therefore to record information about them over time." Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

46. Plaintiff was subjected to the Trade Desk code as described supra starting when he requested that the Website load on his device on February 25, 2026.

**ZoomInfo Code**

47. ZoomInfo operates as a data broker, aggregating, AI-analyzing, and selling detailed professional contact information and business intelligence. It builds

its massive database by scraping public websites, email signatures, and utilizing third-party data, targeting sales, marketing, and recruiting teams.

48. ZoomInfo code causes signaling, addressing and routing information to be sent to ZoomInfo via electronic impulses emanating from the devices of visitors to the Website.

49. When a visitor device communicates with the Website (for example, when she types Defendant's name, or the URL of the Website's homepage, into the address bar at the top of a browser page), the ZoomInfo code automatically captures and processes device, browser, and browser network data transmitted as part of that communication. These data include browser type and version, information about the visitor's device and configurations thereof, referring and exit pages and URLs, page views, loads and clicks, and time and date of use.

50. The ZoomInfo code deployed on the Website further enhances traceability by deploying first-party or third-party cookies and unique session or visitor identifiers stored in the visitor's browser. These mechanisms allow Defendant and ZoomInfo to (a) recognize repeat visits even when the visitor's IP address changes; (b) link multiple visits to the same visitor or network; and (c) maintain continuity of tracking over time. This enables prospective tracking of future visits.

51. ZoomInfo promises to prospective businesses: "Find and close your next customer before your competitors do with our all-in-one platform that tells you who to reach and how to reach them." It also promises to help its customers "[g]ain a complete view of [their] customers. Know who they are, what they need, and the best time to reach them."

52. Plaintiff was subjected to the ZoomInfo code as described supra starting when he requested that the Website load on his device on February 25, 2026.

**Clickagy Code**

53. Clickagy is registered as a data broker in California and collects online identifiers and behavioral information tied to a browser or device, using it to build

or refine interest-based segments its customers use for advertising and analytics. Adobe, a Clickagy data/technology partner, claims that Clickagy tracks behavioral data on the large majority of internet-connected devices in the US every month.

54. Clickagy uses data to specifically identify visitors to websites operated by its affiliates and affiliates' customers, including by linking browsing data or other identifiers to additional data points tied to an individual. In effect, anonymous site traffic can get de-anonymized/matched to real people or companies. Clickagy may associate pseudonymous and other identifiers that might be related to each other, *i.e.,* linking a person's various devices/browsers into a single profile.

55. Clickagy matches devices and the people associated with those devices to topics tied to the web pages they visit, using natural language processing or similar automated content analysis to determine in real-time what a visited page is about. This "buyer intent" data is then used for Clickagy's own, and its customers,' marketing, research, and business-development purposes — not for just the purposes of the Website that deploys Clickagy code.

56. Plaintiff was subjected to the Clickagy code as described supra starting when he requested that the Website load on his device on February 25, 2026.

**LinkedIn Code**

57. LinkedIn is an advertising juggernaut. It earns billions each year through advertising its customers products and services on the LinkedIn social media platform. To accomplish this, it must collect tremendous amounts of data from individuals browsing the internet, identifying them, and building (and later enhancing) profiles on them.

58. Defendant installed and configured the LinkedIn code on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn for Defendant's benefit, all without visitors' knowledge or consent.

59. LinkedIn's own promotional materials for the LinkedIn code explicitly state that the technology "unlocks powerful demographic insights about your website visitors, including their job titles, companies, industries, and more."

60. The LinkedIn code installed on the Website collects and relies on device- and browser-related data that seems merely technical and innocuous but that are frequently used to confirm a website visitor's identity. These include such minor things as browser type, version, and configuration settings, operating system architecture/version information, and display characteristics such as screen resolution and color depth. As alleged supra, an individual can be identified based on such data, particularly when a company like LinkedIn has the individual's approximate location.

61. The LinkedIn code specifically targets data elements that create unique digital signatures for individual users, including Plaintiff and members of the putative class. The LinkedIn code causes an identifier (LinkedIn Ads ID, li_adsid) to be added into visitors' browsers (which exist on their devices) that is "persistent" – meaning it can last months or even years after the visitor's visit to a website ends. The persistent identifier(s) loaded onto a visitor's browser on her device links her visits to different websites, what she buys on them, pages she selects to view, and information she enters to a unified advertising profile of her. This profile is used to track when she makes purchases and to target her with ads for a website operator's products when she goes to other websites. This is referred to as "retargeting."

62. LinkedIn also represents to customers like Defendant that it uses the profiles to reach visitors across devices. Defendant installed this software on its Website to enable reliable visitor identification and long-term tracking across multiple website sessions.

63. LinkedIn explains that installing the code "creates cookies" and a first-party pseudonymous identifier on visitors' browsers, supporting LinkedIn's ability

to build website audiences for retargeting and to perform conversion tracking tied to member accounts.

64. LinkedIn publicly discloses to potential customers like Defendant that the "Personalized Advertising" cookies part of the LinkedIn code include:

(a) UserMatchHistory, used for an ID synchronization process and storing the last sync time;

(b) li_sugr, used to make a probabilistic match of a website visitor's identity; and

(c) _guid, used to identify a LinkedIn member for advertising through Google ads (relevant where the visitor is a LinkedIn member and the cookie is applicable).

65. The UserMatchHistory cookie, using the persistent identifiers that are loaded onto a visitor's device by the LinkedIn Software, allows LinkedIn to match up visits to different websites that deploy the LinkedIn code and tie them to a single individual.

66. Defendant's decision to deploy LinkedIn's tracking code on the Website integrates Defendant's Website into LinkedIn's advertising identity-matching and audience-building ecosystem.

67. By deploying the LinkedIn code, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com. LinkedIn itself identifies (at minimum) snap.licdn.com and px.ads.linkedin.com as domains associated with the LinkedIn Software operation. Defendant configured the LinkedIn Software to automatically route data and signals that contain a visitor's data to LinkedIn's infrastructure.

68. Plaintiff was subjected to the LinkedIn code as described supra starting when he requested that the Website load on his device on February 25, 2026.

**Meta Code**

69. Meta is a digital advertising behemoth, earning approximately $196.2 billion in advertising revenue in 2025 alone. It leverages data about consumers it receives because of Meta code installed and deployed on the websites of companies that seek to advertise on Meta platforms including Facebook and Instagram to produce its massive advertising haul. Meta code operates on approximately 9% of all websites worldwide.

70. The Meta code performs data collection, behavioral analysis, user retargeting, and analytics. It uses a sophisticated algorithm to track people, recently described by Meta whistleblowers as "absolutely relentless in the pursuit of people."

71. The Meta code allows Meta to obtain and store at least the following visitor data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).

72. Meta utilizes the data collected through the Meta code for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as ad targeting and retargeting, in which Meta uses the Meta code to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. The profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's audience network. Meta also uses the data for conversion tracking, in which Meta uses the Meta code to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter. Data is also used for "Audience Insights and Analytics," a feature by which Meta provides data to businesses on user demographics, interests, and behaviors across their sites and apps. Meta also uses the data for cross-device and cross-platform tracking, in which Meta

uses the Meta code to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This feature ensures that advertisers can follow users across devices.

73. Plaintiff was subjected to the Meta code as described supra starting when he requested that the Website load on his device on February 25, 2026.

**Troubling Implications of Third-Party Data Sharing**

74. Companies using third-party tracking software – such as the Third Party Code described *supra* – seek to minimize its surveillance abilities and uses. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

75. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

76. As a data broker, Trade Desk can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law

enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

77. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[7]

78. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[8]

79. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[9]

80. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[10] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

---

[7] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last viewed 6/8/2026).
[8] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).
[9] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).
[10] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

81. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[11]

82. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[12]

**Data and Related Profiles of Consumers Have Economic Value**

83. The type of visitor data transmitted via the Website to the Data Brokers, LinkedIn and Meta has economic value – as it obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Third Party Code on the Website.

84. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many

---

[11] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

[12] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/2026).

websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[13]

85. As recently explained by the Law Institute:[14]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with

---

13 *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

14 https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

> remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

86. There exists an established market for the type of personal data collected and transmitted through the Third Party Code running on the Website – data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**Plaintiff's Visit on February 25, 2026**

87. After the homepage of the Website loaded onto Plaintiff's computer during his February 25, 2026 visit, Plaintiff encountered a banner stating: "This website uses cookies to enhance user experience and to analyze performance and

traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners."

88. To the right of this text on the banner appeared first a hyperlink reading "Manage Preferences" and second, a black button bearing the words "Allow All."

89. Plaintiff clicked on the hyperlink, causing a pop up window to appear on his screen. Below is an image of the pop up as it initially appeared to Plaintiff:




90. The top half of the pop up reads as follows:

> **Your Privacy Rights**
>
> When you visit our website, we store cookies on your browser to collect information The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different

> category headings to find out more and change our default settings according to your preference. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out, etc.). For more information about the First and Third Party Cookies used please follow this link
> Cookie Policy

91. Beneath this text appears a table with four rows that are "expandable," indicated by a "+." The top row refers to "Strictly Necessary Cookies." This row indicates that such cookies are "Always Active."

92. Below the top row are 3 rows, each referring to a specific category of cookies: "Functional Cookies"; "Performance Cookies"; and "Targeting Cookies." To the right of each of these categories appears a "toggle switch" that is in the "on" position, meaning that the default choice presented to a visitor is that she approves the operation of the cookie category in question. That the toggle switch is in the "on" position is indicated by the fact that it is shaded in light blue, and contains a dark blue circle placed in the right half of the switch. By clicking on the switch, one turns the switch to the "off" position. That position is indicated when the switch is shaded in light grey or off-white and contains a dark gray circle placed in the left half of the switch.

93. Below the table are 2 black buttons bearing white text. The button on the left reads "Allow All" – indicating that a visitor is choosing to allow all categories of cookies listed to operate on the Website during her visit. The button on the right reads "Confirm My Choices." This button allows a visitor who turns any number of the 3 toggle switches to the "off" position to confirm that she is rejecting the use of any combination (or all of) the Functional Cookies, Performance Cookies and Targeting Cookies operating on the Website during her visit.

94. Expanding the row devoted to Functional Cookies exposes the following text: "These cookies are used to enhance your experience by remembering

your selections. Functionalities implemented by these cookies support features such as geolocation to serve you a more relevant site experience."

95. Expanding the row devoted to Performance Cookies exposes the following text:

> These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

96. Expanding the row devoted to Targeting Cookies exposes the following text:

> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

97. When Plaintiff encountered the "Your Privacy Rights" pop up, he turned each of the 3 toggle switches on the table from the "on" position to the "off" position – indicating his choice to reject all cookies other than "Strictly Necessary" ones operating on the Website during the visit. He then clicked on the "Confirm My Choices" button.

98. By taking such action, Plaintiff understood that he was refusing to consent to the use of any cookies listed in the table other than "Strictly Necessary Cookies." Further, Plaintiff believed that by clicking "Confirm My Choices" he was preventing the use of any cookies appearing in the list other than "Strictly Necessary Cookies."

99. Once Plaintiff, who, upon interacting Defendant's consent interface as described *supra*, rejected the use of cookies on the Website other than "Strictly Necessary" ones and clicked the "Confirm My Choices" button, he was then able to

browse the Website as the interface disappeared from his screen. This was the case with all visitors similarly situated to Plaintiff.

100. After completing the consent interface, Plaintiff visited numerous pages of the website including pages containing content about Defendant's courses, services and products.

**The Consent Interface Defrauded Plaintiff and Other Website Visitors**

101. As demonstrated with respect to Plaintiff's February 25, 2026 visit to the Website in a recording known as a "HAR File," after Plaintiff rejected all non-"Strictly Necessary" cookies, the Data Broker Code and Social Media Code deployed on Defendant's Website described *supra* continued transmitting Plaintiff's personal information to third parties including the Data Brokers, LinkedIn and Meta. That information included the webpages on the Website he visited and data that, on information and belief, identified him. The information was collected for commercial uses by Defendant, the Data Brokers, LinkedIn and Meta, including targeting Plaintiff and others with advertisements for Defendant's courses on topics concerning leadership and professional advancement; customized corporate training services; and senior leadership coaching solutions. It was also collected by the Data Brokers to build or enhance a profile of him for sale to other third parties.

102. In other words, Plaintiff's exercise of his option to choose to continue browsing the Website without being subjected to any cookies other than "Strictly Necessary Cookies" had no impact on the operation of cookies on the Website, including but not limited to the Third Party Code, during his visit.

103. The type of data that continued to be shared with the Data Brokers, LinkedIn and Meta ***after*** Plaintiff rejected the use of cookies other than "Strictly Necessary" ones was similar or identical to the data transmitted to the Data Brokers, LinkedIn and Meta in ***before*** Plaintiff interacted with Defendant's consent interface. The same can be said of the data shared from visitors to the Website similarly

situated to Plaintiff after they rejected, at the very least, the use of Targeting Cookies through Defendant's consent interface.

104. Defendant's consent interface as described herein led Plaintiff, and all Website visitors similarly situated to Plaintiff, to believe that the Website would not deploy the categories of cookies that they rejected by switching the toggle switch or switches on the table on the pop up to the "off" position. Plaintiff, and such visitors, therefore relied to their detriment on Defendant's representations about confirming their choices with respect to optional cookies operating on the Website, and on Defendant's omissions regarding the fact that cookies other than "Strictly Necessary Ones," and specifically "Targeting Cookies," would continue to operate on the Website notwithstanding visitors' express rejection of them.

105. Defendant intended for such reliance to occur because Defendant profited through the continued operation of the Third Party Code on the Website as to visitors who rejected the use of, at the very least, Targeting Cookies, through Defendant's consent interface.

106. Defendant's misrepresentations and omissions about the ability of Plaintiff and other visitors to the Website similarly situated to Plaintiff to prevent or halt the use of optional cookies by turning off all categories of cookies other than "Strictly Necessary" ones by turning to the "off" positions the toggle switches as described herein, were known exclusively to, and actively concealed by, Defendant. The misrepresentations and omissions were not reasonably known to Plaintiff and members of the putative class. Further, Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and putative Class members as to whether to remain on, and continue to use, the Website. The misrepresentations and omissions were material at the time made, because, when presented with Defendant's consent interface, Plaintiff and putative Class members had the option to leave the Website rather than allow the Website to subject them to cookies other than those that were "Strictly Necessary."

107. Defendant benefited and profited from its misrepresentations and omissions regarding the use of the optional cookies and "tracking technologies" because such misrepresentations and omissions, *inter alia*, permitted (and continue to permit) Defendant to market and advertise its courses and services to Plaintiff and putative Class members in a more profitable and cost-effective manner.

## CLASS ALLEGATIONS

108. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and when interacting with Defendant's consent interface, (1) switched the toggle switch to the right of "Targeting Cookies" to the "off" position (including persons who also did the same with regard to either or both "Functional Cookies" and "Performance Cookies"), and (2) thereafter clicked on the "Confirm My Choices" button.**

109. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

110. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

111. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;

b. Whether Defendant's representations and omissions in its cookie consent interface were false when made;

c. Whether Defendant's representations and omissions were material to Plaintiff and Class members at the time they were made;

d. Whether Defendant intended to induce reliance by Plaintiff and Class members on its representations and omissions;

e. Whether Plaintiff and Class members are entitled to statutory damages;

f. Whether Plaintiff and Class members are entitled to punitive damages;

g. Whether Plaintiff and Class members are entitled to injunctive relief;

h. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

i. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

112. TYPICALITY: Plaintiff was subjected to the Trade Desk and LinkedIn code running on the Website when he visited the Website on February 25, 2026; he rejected consent to the Website's use of cookies Defendant's deployment of cookies and/or "tracking technologies" other than those that are "necessary for [Defendant's] site to function properly and [ ] always [turned] on"; and he remained on the Website after such rejection. Further, information about his activity on the Website and data that identified him was transmitted to Trade Desk and LinkedIn, and possibly other third parties, for fingerprinting, identification and tracking purposes. His claims are therefore typical of the Class.

113. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

114. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Common Law Fraud, Deceit and/or Misrepresentation

115. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

116. Defendant fraudulently and deceptively represented to Plaintiff and Class members that Plaintiff and Class members could choose to reject the use of cookies other than "Strictly Necessary" ones, and that such rejection would effectively prevent or halt the operation of non-"Strictly Necessary" cookies on the Website during their visits.

117. The representations were false and deceptive, and omitted material facts, because after Plaintiff and the Class members rejected the use of the cookies other than "Strictly Necessary" ones, the Third Party code continued to operate on the Website during their visit, transmitting the personal data of Plaintiff and the Class members to the Data Brokers, LinkedIn and Meta for fingerprinting, targeting and other forms of commercial exploitation.

118. Defendant's misrepresentations and omissions about these facts were known exclusively to, and actively concealed, by Defendant. They were not

reasonably known to Plaintiffs and Class members at the time they were made. Defendant knew, or should have known, how its Website functioned, and how the Third Party Code deployed on the Website operated – including whether any changes to its operation occurred after a visitor rejected the use of cookies other than "Strictly Necessary" ones using Defendant's consent interface.

119. Defendant's misrepresentations and omissions about the ability of Plaintiff and the Class members to decline the use of cookies other than "Strictly Necessary" ones were material when made because they concerned facts that were critical to the decision of Plaintiff and Class members whether to stay on and/or continue browsing the Website. Plaintiff and the Class members could have terminated their visits to the Website if they had learned that they would be subjected to cookies other than "Strictly Necessary" ones referenced in Defendant's consent interface, causing information about their activities on the Website, including the webpages they visited, and data that identified them, to be transmitted to third parties including the Data Brokers, LinkedIn and Meta through the Website.

120. By making the misrepresentations and omissions, Defendant breached its duties to Plaintiff and the Class members. Defendant also profited from the breach, because the transmission of the information about Plaintiff and Class members through the Website's use of cookies other than "Strictly Necessary" ones made Defendant's marketing and advertising more efficient and effective. Plaintiff believes that additional ways in which Defendant profited from the fraudulent and deceptive practices described herein will be revealed through discovery.

121. Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment by informing them that they could use the Website without being subjected to the Website' s use of cookies other than "Strictly Necessary" ones. Operating under the mistaken belief that they had rejected such use, and thereby had prevented or halted it, Plaintiff and Class members allowed

more of their personal information to be transmitted to third parties, including the Data Brokers, LinkedIn and Meta, than they would have otherwise.

122. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Such reliance was justifiable and reasonable. There was nothing to indicate to Plaintiff or Class members that Defendant's consent interface contained misrepresentations and/or fraudulent omissions.

123. Plaintiff and Class members were injured as a direct and proximate result of Defendant's misrepresentations and fraudulent omissions, and their reasonable and justifiable reliance thereupon. Their injuries include the loss of money and/or property. The data of Plaintiff and Class members fraudulently and deceptively transferred to Trade Desk have economic value. Defendant's fraudulent and deceptive use of cookies other than "Strictly Necessary" ones referenced in Defendant's consent interface, resulting in the transmission and possible sale of the personal information of Plaintiff and Class members to third parties (including the Data Brokers, LinkedIn and Meta) diminished the value of such information to Plaintiff and Class members. Further, Defendant's use of cookies other than "Strictly Necessary" ones under the circumstances injured the right of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties. The injuries to Plaintiff and Class members also include the unauthorized creation of detailed behavioral profiles of them; the mental anguish of Plaintiff and Class members from knowledge of secret monitoring of them by Defendant, the Data Brokers, LinkedIn and Meta and other third parties; and the chilling of their free online expression and inquiry.

124. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's misrepresentations and omissions concerning the use of the Third Party Code on the Website were made in a malicious, oppressive and

willful manner. These misrepresentations and omissions were made in conscious disregard of the choice made by Plaintiff and the Class members to decline being subjected to cookies other than "Strictly Necessary" ones on the Website that would transmit data to third parties for fingerprinting, identification and tracking and other forms of commercial exploitation.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

125. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

126. Defendant intentionally aimed at increasing its sales and profits, improving its marketing and advertising while making it more cost-effective, through its misrepresentations and fraudulent omissions concerning the choice of Plaintiff and Class members to reject being subjected to cookies other than "Strictly Necessary" ones on the Website that transmitted their data to third parties.

127. There is no legitimate business reason that justifies Defendant's use of misrepresentations and fraudulent omissions concerning the choice of Website visitors to reject being subjected to cookies other than "Strictly Necessary" ones on the Website that transmitted their data to third parties to benefit Defendant financially and commercially.

128. Plaintiff and Class members conferred an economic benefit on Defendant through their decision to continue using the Website after they attempted to reject being subjected to cookies other than "Strictly Necessary" ones on the Website that transmitted their data to third parties.

129. Defendant has been unjustly enriched by its conduct at the expense of Plaintiff and Class members.

130. Defendant understood the economic benefit it received from its unlawful behavior with respect to Plaintiff and Class members. Indeed, Defendant engaged in the unlawful conduct alleged herein in order to obtain the economic

benefit it received from Plaintiff and Class members – and from all other visitors to the Website.

131. It would be unjust for Defendant to retain benefits and profits it received based on the value of the information about Plaintiff and Class members shared by Defendant through the use of cookies other than "Strictly Necessary" ones with third parties including the Data Brokers, LinkedIn and Meta. The data sharing resulting from the use of non-"Strictly Necessary" cookies was achieved unlawfully and wrongfully, and without the consent of Plaintiff and Class members.

132. Plaintiff and Class members are entitled to restitution of the benefits so received by Defendant. Further, they are entitled to any amounts required to place them in the position they occupied prior to Defendant's deployment of non-"Strictly Necessary" on the Website (after Defendant had defrauded Plaintiff and Class members into believing that they had prevented or halted such deployment) to transmit their data to the Data Brokers, LinkedIn and Meta, and other third parties.

**<u>THIRD CAUSE OF ACTION</u>**

**Violations of California Trap and Trace Law, Cal. Penal Code § 638.51**

133. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

134. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

135. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

136. The Third Party Code as deployed on the Website constitutes a trap and trace device under Cal. Penal Code§ 638.50(c).

137. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

138. The Third Party Code is designed to identify the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "***sources***" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

139. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Biglang-Awa-Castro v. SBE Restaurant Group, LLC*, 25VECV03590, 2026 Cal. Super. LEXIS 29752, at *3-4 (L.A. Co. Super. Ct. Apr. 16, 2026); *Schallert v. RocketGenius*, 25STCV35081, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. March 24, 2026); *Hassid v. Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Lucky Opco LLC,* 25STCV03961, 2026 Cal. Super. LEXIS 24132, at *5-6 (L.A. Co. Super. Ct. Jan. 5, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1030-32 (C.D. Cal. 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42

(C.D. Cal. Dec. 4, 2025); *Santoro v. Lulu & Georgia, Inc.*, 25STCV11722, 2025 Cal. Super. LEXIS 84529, at *8-9 (L.A. Co. Super. Ct. Nov. 21, 2025); *Zhizhi Xu v. Reuters News & Media, Inc.*, 25CV459918, 2025 Cal. Super. LEXIS 76169, at *8-10 (Santa Clara Co. Super Ct. Oct. 24, 2025); *Scarlett v. Future US, LLC*, CGC-25-621912, 2025 Cal. Super. LEXIS 56166, at *11-14 (S.F. Co. Super. Ct. Sept. 5, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. The Data Brokers Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

140. Defendant did not obtain a court order before using or installing the Third Party Code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

141. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to the use of cookies other than "Strictly Necessary"

ones transmitting the data of Plaintiff and Class members to Trade Desk and LinkedIn.

142. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

143. Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; their mental anguish from knowledge of the secret monitoring of them by Defendant, the Data Brokers, LinkedIn and Meta; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

144. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

145. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## <u>FOURTH CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

146. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

147. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

148. Defendant's deployment of the Third Party Code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class

members were involved in – namely their visit to the Website. The intrusion allowed the Data Brokers, LinkedIn and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

149. Plaintiff and the Class members never authorized use of the Third Party Code on the Website.

150. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

151. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

152. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the Third Party Code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

153. The intrusion described herein would be highly offensive to a reasonable person.

154. Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; their mental anguish from knowledge of the secret monitoring

of them by Defendant, the Data Brokers, LinkedIn and Meta; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

155. Defendant's invasion of the privacy of Plaintiff and Class members damaged them. They are therefore entitled to compensatory damages, which includes monetary damages.

156. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Third Party Code on the Website was malicious, oppressive and willful. That use includes both the installation of the Code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their effective actions preventing or halting the use of cookies other than "Strictly Necessary" ones on the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to prevent or halt such use.

157. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## PRAYER

WHEREFORE, Plaintiff, on his behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. An award of statutory damages pursuant to CIPA;
3. An award of punitive damages;
4. An award of nominal damages;
5. An order for full restitution;
6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: August 14, 2026 TAULER SMITH LLP

By: ________________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Erik Yates*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: August 14, 2026

TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Erik Yates*